# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

National Election Defense Coalition, :
Citizens For Better Elections, :
Rich Garella, Rachel A. Murphy, :
Caroline Leopold, Stephen Strahs, :
Kathleen Blanford, Sharon Strauss, :
Anne C. Hanna, Raphael Y. Rubin, :
Robert F. Werner, Sandra :
O'Brien-Werner, Thomas P. Bruno, Jr., :
Roger Dreisbach-Williams, and :
Jeff R. Faubert, :
                      Petitioners :
                       :
            v. : No. 674 M.D. 2019
                      : Argued: October 15, 2020
                      :
Kathy Boockvar, :
Secretary of the Commonwealth, :
               Respondent :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge[1]
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge


**OPINION BY JUDGE BROBSON**         **FILED: October 18, 2021**


Before the Court are the preliminary objections of Respondent Kathy Boockvar, Secretary of the Commonwealth (Secretary),[2] to the amended petition for review (Petition) filed in this Court's original jurisdiction by Petitioners National Election Defense Coalition (NEDC), Citizens For Better Elections (CBE), Rich

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

[2] On February 8, 2021, after the Petition was filed with this Court, Veronica Degraffenreid was appointed Acting Secretary of the Commonwealth. *See* Department of State website at https://www.dos.pa.gov/about-us/pages/secretary-of-the-commonwealth.aspx (last visited Oct. 15, 2021).

Garella, Rachel A. Murphy, Caroline Leopold, Stephen Strahs, Kathleen Blanford, Sharon Strauss, Anne C. Hanna, Raphael Y. Rubin, Robert F. Werner, Sandra O'Brien-Werner, Thomas P. Bruno, Jr., Roger Dreisbach-Williams, and Jeff R. Faubert. We now sustain the Secretary's preliminary objection raising a demurrer to Count V of the Petition and overrule the remaining preliminary objections.

## I. BACKGROUND

The Secretary is charged with the general supervision and administration of Pennsylvania's election laws, including the duty "[t]o examine and reexamine voting machines, and to approve or disapprove them for use in this state, in accordance with the provisions of [the Pennsylvania Election Code (Election Code)[3]]." Section 201(b) of the Election Code, 25 P.S. § 2621(b). Petitioners filed the instant action against the Secretary, challenging the certification of the ExpressVote XL electronic voting machines (ExpressVote XL machines) for use in Pennsylvania elections on the basis that the certification violates multiple provisions of the Election Code and impairs Pennsylvania citizens' rights under the state constitution.[4]

### A. Petition

#### 1. Petitioners

Petitioners allege that NEDC and CBE are nonprofit groups and that the remaining Petitioners are members of the Pennsylvania electorate (Individual Petitioners). (Petition ¶ 5.) The "core missions" of NEDC and CBE "include helping members of the electorate exercise their right to vote in free and fair

---

[3] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591. The Act of July 11, 1980, P.L. 600, added Article XI-A to the Election Code, 25 P.S. §§ 3031.1-.20.

[4] According to the Petition, Acting Secretary Robert Torres originally certified the ExpressVote XL machines. (Petition at 3 n.2.) Kathy Boockvar was thereafter appointed Acting Secretary of the Commonwealth on January 5, 2019, and confirmed by the Senate on November 19, 2019. (*Id.*)

2

elections[] and working to ensure that elections be conducted on systems that are secure, accessible, transparent, and auditable." (*Id*.) NEDC and CBE include voting members of the Pennsylvania electorate within their organizations, including members located in Philadelphia and Northampton Counties—two counties that purchased the ExpressVote XL machines following the Secretary's certification of them for use in Pennsylvania elections. (Petition ¶¶ 3, 5.) More specifically, NEDC and CBE have at least one member from these counties who each has "voted in the November 2019 election where the ExpressVote XL [machines were] first used and plans to continue to vote in Pennsylvania elections where the ExpressVote XL [machines] will be used." (Petition ¶¶ 15, 17.)

The Individual Petitioners live in, and are duly qualified electors of, Philadelphia and Northampton Counties. (Petition ¶¶ 18-31.) They were required in the November 2019 election to use the ExpressVote XL machines that are the subject of this action, and they expect to use them in future elections. (Petition ¶ 32.) "Each Individual [Petitioner] . . . wants to cast a ballot in future elections, and each wants their future votes and the votes of all Pennsylvanians to be properly marked, counted, and tallied," but they have "concerns over the security and reliability of the ExpressVote XL" machines. (Petition ¶¶ 33-34.)

2. Certification of the ExpressVote XL Machines

According to the Petition, the ExpressVote XL machines are commonly referred to as all-in-one hybrid voting machines, because they combine two tasks—marking a voter's choices on a piece of paper and tabulating votes from a piece of paper—which are more often performed by two separate devices. (Petition ¶¶ 41-42.) On November 30, 2018, the Secretary certified Election Systems & Software's (ES&S) electronic voting system (EVS), EVS 6.0.2.1, which

3

included the ExpressVote XL machines. (Petition ¶¶ 69, 71.) On July 16, 2019, NEDC and CBE filed a petition (Reexamination Petition) with the Secretary, requesting reexamination of the ExpressVote XL machines based on ten enumerated grounds. (Petition ¶¶ 72-73.) The Reexamination Petition was signed by 200 duly registered electors in Pennsylvania and was filed along with a check for $450. (Petition ¶ 72.)

On September 3, 2019, following a reexamination conducted at the Colorado offices of SLI Compliance, a voting system test lab, the Secretary issued a report titled *Report Concerning the Reexamination Results of Election Systems and Software ExpressVote XL* (Report).[5] (Petition ¶¶ 77-78.) In the Report, the Secretary outright dismissed without consideration by SLI Compliance seven of the ten grounds asserted by NEDC and CBE—identified as claims three through seven, nine, and ten—on the basis that they "amount to purely legal arguments which do not apply to reexamination or certification of an [EVS]." (Petition ¶¶ 80, 82 (quoting Report at 2).) As to the remaining grounds—claims one, two, and eight,—which the Secretary directed SLI Compliance to consider, the Secretary concluded that the ExpressVote XL machines did not violate the Election Code but listed several "additional conditions" that jurisdictions using the machines "must" implement. (Petition ¶¶ 82-83 (quoting Report at 11-12[6]).) Petitioners aver that the Secretary's position essentially concludes that the ExpressVote XL machines do "not violate the Election Code on the express assumption that jurisdictions using the machine[s]

---

[5] The Report is attached to the Petition as Exhibit B.

[6] The Secretary "maintain[ed] the certification . . . subject to . . . additional conditions" relating to implementation of "proper poll closing and vote record transportation procedures[,]" "vote summary record instructions" for voters and poll workers, and "poll worker training." (Report at 11-12.)

4

would implement these 'additional conditions,'" but "[t]he Secretary does not have statutory authority to enforce these 'additional conditions'" nor "a mechanism in place to enforce the 'additional conditions' or penalize counties that do not follow them." (Petition ¶¶ 84-86.)

3. The ExpressVote XL Machines' Use in Pennsylvania Counties

Petitioners aver that Philadelphia, Northampton, and Cumberland Counties purchased the ExpressVote XL machines following their certification. (Petition ¶ 87.) Philadelphia and Northampton Counties used the machines in the election on November 5, 2019, but Cumberland County did not because it was not yet in possession of the machines. (Petition ¶ 90.) Petitioners aver that all three counties intended to use the machines as the primary voting machine for the primary and general elections in 2020, which had not yet occurred at the time the Petition was filed, and beyond. (Petition ¶ 92.)

4. Alleged Violations of the Election Code and the Pennsylvania Constitution

Petitioners raise several concerns regarding the ExpressVote XL machines. Specifically, they aver that the ExpressVote XL machines do not provide acceptable ballot security in that the paper path is insecure (Petition ¶¶ 93-127), the administrator access panel is insecure (Petition ¶¶ 128-37), and the "test deck" feature is insecure (Petition ¶¶ 138-48). They also allege that the ExpressVote XL machines fail to provide all voters with the necessary privacy and absolute secrecy in the voting process due to the chronological ordering of ballot cards (Petition ¶¶ 158-74) and the procedures for vote spoliation that require a poll worker to enter the voting booth (Petition ¶¶ 175-202). Petitioners further aver that the Secretary's reexamination did not resolve the concerns raised in the Reexamination Petition (Petition ¶¶ 248-65) and that the ExpressVote XL machines experienced

5

multiple issues during their use in the November 2019 election in Philadelphia and Northampton Counties, including failure to tabulate votes correctly. (Petition ¶¶ 264-69.)[7] Finally, they aver that continued use of the ExpressVote XL machines will cause irreparable harm to the electorate of the affected counties. (Petition ¶¶ 272-76.)

Based on the foregoing, Petitioners assert six counts in their Petition, five of which are currently in dispute.[8] The first three counts pertain to alleged security,

_____

[7] The Petition contains several errors with regard to how the paragraphs set forth therein are numbered. Relevant here, the Petition includes one set of paragraphs numbered as 264 and 265, followed by another set of paragraphs numbered as 264 and 265. We note that the first citation to the Petition in the sentence above thus refers to the first set of paragraphs numbered 264 and 265, and the second citation refers to the second set.

[8] With respect to Count V of the Petition, in which Petitioners allege that the ExpressVote XL machines do not comply with several provisions of the Election Code relating to ballot formatting requirements, the basis of the Secretary's preliminary objection that Count V fails to state a claim for which relief can be granted changed in light of the amendments to the Election Code. In Count V of the Petition, Petitioners first claim that the ExpressVote XL machines violate Section 1109-A(e) of the Election Code, 25 P.S. § 3031.9(e) (requiring that "ballot cards or paper ballots and ballot pages . . . be printed on card or paper stock of the color of the party of the voter and [that] the appropriate party affiliation or independent status . . . be printed on the ballot card"). (Petition ¶ 287.) Petitioners also claim that ExpressVote XL machines violate Section 1004 of the Election Code, 25 P.S. § 2964 (requiring "[a]ll the ballots for the same election district [to] be bound together in books of fifty, in such manner that each ballot may be detached and removed separately"). (Petition ¶ 288.) Section 3 of the Act of March 27, 2020, P.L. 41 (Act 12), however, eliminated these requirements. Petitioners further claim that the ExpressVote XL machines violate Section 1112-A(b)(2)-(4) of the Election Code, 25 P.S. § 3031.12(b)(2)-(4) (requiring voter to vote by "making a cross (X) or check (✓) mark or . . . a punch or mark sense mark" either "in the square opposite the name of the candidate" or "in the appropriate space opposite the names of the candidates"). (Petition ¶ 289.) Section 4 of Act 12 also expanded the manner in which a voter may indicate a selection; now, a voter must cast his vote using a cross or check mark, a punch or mark sense mark, or by "otherwise indicating a selection associated with" the candidate. Finally, Petitioners allege that the ExpressVote XL machines violate Section 1109-A(a)(2) of the Election Code, 25 P.S. § 3031.9(a)(2) (requiring that "the first ballot page . . . list in the order that such political parties are entitled to priority on the ballot, the names of such political parties with designating arrows so as to indicate the voting square or position on the ballot card where the voter may insert by one mark or punch the straight

6

reliability, and accuracy violations. Count I asserts a violation of Section 1107-A(12) of the Election Code, 25 P.S. § 3031.7(12), on the basis that the ExpressVote XL machines do "not '[p]rovide[] acceptable ballot security procedures and impoundment of ballots to prevent tampering with or substitution of any ballots or ballot cards.'" (Petition ¶ 278 (quoting 25 P.S. § 3031.7(12)).) Count II asserts a violation of Section 1107-A(13) of the Election Code, 25 P.S. § 3031.7(13), on the basis that the ExpressVote XL machines "do not routinely and consistently 'record[] correctly and compute[] and tabulate[] accurately every valid vote registered.'" (Petition ¶ 280 (quoting 25 P.S. § 3031.7(13)).) Count III asserts a violation of Section 1107-A(11) of the Election Code, 25 P.S. § 3031.7(11), on the basis that the ExpressVote XL machines "are not 'suitably designed and equipped to be capable of absolute accuracy.'" (Petition ¶ 282 (quoting 25 P.S. § 3031.7(11)).)

The fourth count pertains to voter privacy and secrecy violations. Specifically, Count IV asserts a violation of Section 1107-A(1) of the Election Code, 25 P.S. § 3031.7(1), and Article VII, Section 4 of the Pennsylvania Constitution on the basis that the ExpressVote XL machines do not enable "'voting in absolute secrecy[,'] nor do they 'prevent[] any person from seeing or knowing for whom any voter, except one who has received or is receiving assistance as prescribed by law, has voted or is voting.'" (Petition ¶ 284 (quoting 25 P.S. § 3031.7(1)).) Count IV also asserts a violation of Section 1111-A(b) of the Election Code, 25 P.S. § 3031.11(b), "because the ExpressVote XL machines require another person to

_____

party ticket of his choice"). (Petition ¶ 290.) This language was eliminated through the passage of Section 3 of the Act of October 31, 2019, P.L. 552 (Act 77), and Section 4 of Act 12. At oral argument before the Court, Petitioners agreed that the amendments mooted the violations of the Election Code asserted in Count V. Thus, we sustain the Secretary's preliminary objection and dismiss Count V of the Petition, which we will not address further in this Opinion.

7

enter the voting booth in order for a voter to exercise the right to spoil a ballot." (Petition ¶ 285.)

In Count VI, Petitioners assert a violation of Article I, Section 5 of the Pennsylvania Constitution, which guarantees free and equal elections and the free exercise of the right to suffrage. Count VI also alleges a violation of Article I, Section 26 of the Pennsylvania Constitution, which prohibits the Commonwealth and any political subdivision thereof from denying a person the enjoyment of any civil right and discriminating against a person in the exercise of any such right. Petitioners assert that the Secretary's certification of the ExpressVote XL machines and their use in Pennsylvania infringe upon their suffrage rights by "making it likely that a significant number of votes will not be counted accurately[] or at all," creating "the risk that persons for whom the majority of voters have not cast their ballots will be declared the election winners," and creating the risk that votes will be "rendered meaningless or . . . deemed cast for a candidate for whom they did not vote." (Petition ¶¶ 294-95, 297.) Petitioners add that their equal protection rights are at risk because, "while they are compelled to vote in counties using the ExpressVote XL [machines], other registered voters in Pennsylvania may vote in precincts or counties using voting systems, such as verifiable paper ballots that are counted by hand or by optical scanners, that do not suffer from the defects identified in th[e] Petition." (Petition ¶ 298.)

### 5. Relief Sought

By way of relief, in the body of the Petition, Petitioners seek a declaration that the certification of the ExpressVote XL machines violates the aforementioned provisions of the Election Code and the Pennsylvania Constitution, and they seek an order directing the Secretary to decertify the ExpressVote XL machines for use in

8

Pennsylvania. (Petition ¶¶ 10-11.) In their request for relief, they similarly ask this Court to declare that the ExpressVote XL machines violate the Pennsylvania Constitution and Election Code, "[e]njoin the Secretary to decertify" the ExpressVote XL machines for use in Pennsylvania, award Petitioners reasonable attorney's fees and costs, and grant any other relief the Court deems just and appropriate. (Petition at 54-55, "Wherefore" Clause.)

## B. Preliminary Objections

In response to the Petition, the Secretary filed preliminary objections. In her first preliminary objection, the Secretary argues that Petitioners have failed to state a claim for which relief can be granted as to the Election Code violations asserted in Counts I-IV of the Petition because Petitioners have not alleged sufficient facts demonstrating that her certification of the ExpressVote XL machines was fraudulent, in bad faith, an abuse of discretion, or clearly arbitrary, as is required to be successful on those claims. In her second preliminary objection, the Secretary asserts that Petitioners have likewise failed to state a claim for relief under Count VI of the Petition, because Petitioners have not alleged sufficient facts demonstrating a plain, palpable, and clear abuse of power that actually infringes on the exercise of their voting rights with respect to the Secretary's certification of the ExpressVote XL machines, as is required to make out their constitutional claims.

The Secretary also contends that Petitioners lack standing with respect to their alleged Election Code violations in Counts I-IV because they have not alleged an interest in ensuring compliance with the Election Code that is greater than the common interest that all electors have in this regard. Moreover, the Secretary asserts that all counts should be dismissed on the basis that Petitioners failed to join indispensable parties, specifically Philadelphia, Northampton, and Cumberland

9

Counties, all of which have purchased the ExpressVote XL machines and have a strong interest in being permitted to use this voting system in upcoming elections. Finally, the Secretary maintains that Petitioners' claims are time-barred by Section 5522 of the Judicial Code, 42 Pa. C.S. § 5522. As a result of these deficiencies, the Secretary argues that the entire Petition should be dismissed.

## II. DISCUSSION

### A. Standard of Review

In ruling on preliminary objections, we accept as true all well-pleaded material allegations in the petition for review and any reasonable inferences that we may draw from the averments. *Meier v. Maleski*, 648 A.2d 595, 600 (Pa. Cmwlth. 1994). The Court, however, is not bound by legal conclusions, unwarranted inferences from facts, argumentative allegations, or expressions of opinion encompassed in the petition. *Id.* We may sustain preliminary objections only when the law makes clear that the petitioner cannot succeed on the claim, and we must resolve any doubt in favor of the petitioner. *Id.* "We review preliminary objections in the nature of a demurrer under the above guidelines and may sustain a demurrer only when a petitioner has failed to state a claim for which relief may be granted." *Armstrong Cnty. Mem'l Hosp. v. Dep't of Pub. Welfare*, 67 A.3d 160, 170 (Pa. Cmwlth. 2013).

### B. Relevant Law

#### 1. Election Code

Before addressing the preliminary objections individually, consideration of the general framework of the law surrounding the certification of EVSs is warranted. The term "electronic voting system" is defined as "a system in which one or more voting devices are used to permit the registering or recording of votes and in which

10

such votes are computed and tabulated by automatic tabulating equipment."[9] Section 1101-A of the Election Code, 25 P.S. § 3031.1. Under Section 201(b) of the Election Code, 25 P.S. § 2621(b), the Secretary has the affirmative duty "[t]o examine and reexamine voting machines, and to approve or disapprove them for use in this state." The Secretary's determinations about which voting machines to approve and which voting machines to disapprove must be made "in accordance with the provisions of [the Election Code]" and "the requirements of [S]ection 301 of the Help America Vote Act of 2002"[10] (HAVA). 25 P.S. § 2621(b). Section 1105-A of the Election Code, 25 P.S. § 3031.5, relating to examination and approval of EVSs by the Secretary, sets forth the mechanism for certification and decertification of EVSs. It provides, in relevant part:

> (a) Any person or corporation owning, manufacturing or selling, or being interested in the manufacture or sale of, any [EVS], may request the Secretary . . . to examine such system if the voting system has been examined and approved by a federally recognized independent testing authority and if it meets any voting system performance and test standards established by the Federal Government. . . . Any ten or more persons, being qualified registered electors of this Commonwealth, may, at any time, request the Secretary . . . to reexamine any [EVS] theretofore examined and approved by him. Before any reexamination, the person, persons, or corporation, requesting such reexamination, shall pay to the Treasurer of the Commonwealth a reexamination fee of four hundred fifty dollars ($450). The Secretary . . . may, at any time, in his discretion, reexamine any such system therefore examined and approved by him. The Secretary . . . may issue directives or instructions for implementation of electronic voting procedures and for the operation of [EVSs].
>
> (b) Upon receipt of a request for examination or reexamination of an [EVS] as herein provided for or in the event he determines to reexamine

_____

[9] In order to qualify as an "electronic voting system," the system also must "provide for a permanent physical record of each vote cast." Section 1101-A of the Election Code, 25 P.S. § 3031.1.

[10] 52 U.S.C. § 21081, transferred from 42 U.S.C. § 15481.

11

any such system, the Secretary . . . shall examine the [EVS] and shall make and file in his office his report, attested by his signature and the seal of his office, stating whether, in his opinion, the system so examined can be safely used by voters at elections as provided in [the Election Code] and meets all of the requirements hereinafter set forth. If his report states that the system can be so used and meets all such requirements, such system shall be deemed approved and may be adopted for use at elections, as herein provided. . . .

(c) No [EVS] not so approved shall be used at any election, and if, upon the reexamination of any such system previously approved, it shall appear that the system so reexamined can no longer be used safely by voters at elections as provided in [the Election Code] or does not meet the requirements hereinafter set forth, the approval of that system shall forthwith be revoked by the Secretary . . . and that system shall not thereafter be used or purchased for use in this Commonwealth.

25 P.S. § 3031.5(a)-(c).

In order to merit approval for use in the Commonwealth, an EVS must satisfy specific requirements set forth in Section 1107-A of the Election Code.[11] *See* 25 P.S. § 3031.7 (listing requirements relating to, *inter alia*, privacy, security, quality, and accuracy). The requirements at issue here are set forth in subsections (1), (11), (12), and (13) of Section 1107-A, which provide:

No [EVS] shall, upon any examination or reexamination, be approved by the Secretary . . . or by any examiner appointed by him, unless it shall be established that such system, at the time of such examination or reexamination:

(1) Provides for voting in absolute secrecy and prevents any person from seeing or knowing for whom any voter, except one who has received or is receiving assistance as prescribed by law, has voted or is voting.

. . . .

(11) Is suitably designed for the purpose used, is constructed in a neat and workmanlike manner of durable material of good quality, is safely and efficiently useable in the conduct of elections and, with respect to the counting of ballots cast at each

---

[11] HAVA imposes more than a dozen additional requirements. *See* 52 U.S.C. § 21081(a).

12

district, is suitably designed and equipped to be capable of absolute accuracy, which accuracy shall be demonstrated to the Secretary . . . .

(12) Provides acceptable ballot security procedures and impoundment of ballots to prevent tampering with or substitution of any ballots or ballot cards.

(13) When properly operated, records correctly and computes and tabulates accurately every valid vote registered.

25 P.S. § 3031.7(1), (11)-(13).

In addition to the secrecy requirement for EVS certification listed in Section 1107-A(1) of the Election Code above, Section 1111-A of the Election Code, 25 P.S. § 3031.11, provides the following pertinent information regarding the instruction of voters using EVSs while maintaining secrecy:

(b) At the polling place on the day of the election, each voter who desires shall be instructed, by means of appropriate diagrams and a model, in the operation of the voting device before he enters the voting booth. *If any voter shall ask for further instructions concerning the manner of voting after entering the voting booth, any election officer may give him audible instructions without entering such booth*, but no such election officer shall when giving such instructions in any manner request, suggest or seek to persuade or induce any such voter to vote any particular ticket or for any particular candidate or other person or for or against any particular question.

25 P.S. § 3031.11(b) (emphasis added). These provisions serve as the bases for Petitioners' Election Code claims herein.

### 2. Constitutional Provisions

As noted, the instant suit also challenges the certification of the ExpressVote XL machines on the basis that it violates Sections 5 and 26 of Article I and Section 4 of Article VII of the Pennsylvania Constitution. Article I, Section 5 provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, § 5. Article I, Section 26 provides that "[n]either the

13

Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." PA. CONST. art. I, § 26. Article VII, Section 4 provides: "All elections by the citizens shall be by ballot or by such other method as may be prescribed by law: Provided, That secrecy in voting be preserved." PA. CONST. art. VII, § 4.

### 3. Case Law

Also relevant to our analysis are earlier decisions of this Court and the Pennsylvania Supreme Court relating to a similar attempt to obtain decertification of a voting system. In 2006, electors filed an action in this Court's original jurisdiction against the Secretary, seeking decertification of Direct Recording Electronic voting systems (DREs) for use in Pennsylvania.[12] That lawsuit resulted in several opinions of interest to our analysis: *Banfield v. Cortes*, 922 A.2d 36 (Pa. Cmwlth. 2007) (en banc) (*Banfield I*),[13] overruling preliminary objections; *Banfield v. Aichele*, 51 A.3d 300 (Pa. Cmwlth. 2012) (en banc) (*Banfield II*), denying an application for partial summary judgment filed by the electors; *Banfield v. Aichele* (Pa. Cmwlth., No. 442 M.D. 2006, filed October 1, 2013) (*Banfield III*), granting an application for summary relief filed by the Secretary; and *Banfield v. Cortes*, 110 A.3d 155 (Pa. 2015) (*Banfield IV*), affirming this Court's order granting the Secretary summary relief.

In the *Banfield* litigation, the electors averred that the various certified DREs failed during elections conducted in Pennsylvania and other states in a variety of

---

[12] The action seeking decertification of DREs was docketed as *Banfield v. Cortes*, 442 M.D. 2006, which we will generally refer to as the *Banfield* litigation.

[13] The Supreme Court denied permission to appeal by order dated December 16, 2008, docketed at 70 MM 2007.

ways, including losing votes, registering votes for the wrong candidate, causing very high "undervote" rates, failing to register votes when the ballot contained only one question, counting votes more than once, reporting phantom votes, failing to record votes due to programing errors, failing to activate for use, failing to record write-in votes, and failing in a number of aspects with regard to what the electors refer to as "zero tapes."[14] *Banfield I*, 922 A.2d at 40. The electors also averred the DREs suffered from security issues in that a variety of the models of DREs could be corrupted in a brief amount of time through unauthorized access. The electors averred that the Secretary's certification of DREs resulted from "deficient examination criteria." *Id.* at 41. The electors sought a judgment declaring that the Secretary had violated the Election Code and the Pennsylvania Constitution and directing the Secretary to decertify the DREs, establish uniform testing criteria, and reexamine certain DREs previously certified by the Secretary. In response, the Secretary filed sixteen preliminary objections, including preliminary objections based on failure to state a claim for mandamus, failure to join indispensable parties, lack of standing, and legal insufficiency (demurrer), all of which are relevant to the matter now before this Court. We addressed those preliminary objections in *Banfield I*, overruling them all.

As to the Secretary's preliminary objection that we should dismiss the electors' petition because it sought mandamus relief but failed to state a claim for which mandamus could be granted, we explained:

---

[14] "DREs are devices that display ballots and allow a voter to make choices with a push button, dial or touch screen and then cast the vote. DREs are supposed to record the vote on an electronic storage device in the form of digital markings." *Banfield I*, 922 A.2d at 40. In essence, they are paperless systems, meaning they "produce no contemporaneous external paper record that would allow voters to verify that their votes were recorded accurately." *Id.*

15

> Mandamus is an extraordinary remedy designed to compel official performance of a ministerial act or mandatory duty where there exists a clear legal right in the plaintiff and a corresponding duty in the defendant and where there is no other adequate remedy at law. *County of Allegheny v. [Cmwlth.]*, . . . 544 A.2d 1305 ([Pa.] 1988). Mandamus will not lie to compel the performance of discretionary acts *except* where the exercise or non-exercise of discretion is arbitrary, fraudulent, or based upon a mistaken view of the law. *Camiel v. Thornburgh*, . . . 489 A.2d 1360 ([Pa.] 1985). "If [an official] abuses his [or her] discretion or acts under a mistaken view of the law, mandamus will lie to compel proper action." *Duncan Meter [Corp.] v. Gritsavage*, . . . 65 A.2d 402, 403 ([Pa.] 1949).

*Banfield I*, 922 A.2d at 42 (emphasis in original). We rejected the Secretary's arguments that the electors were not entitled to relief because the Secretary's decisions to certify DREs, to establish DRE testing criteria, and to conduct reexaminations are discretionary and because the electors did not have a clear right to have the Secretary decertify the DREs. In doing so, we concluded, in part, that the electors alleged facts sufficient to establish that the Secretary's decisions in these regards "were arbitrary or based on a mistaken view of the law." *Id.*

As to the Secretary's preliminary objection based on the "failure to join indispensable parties, *i.e.*, the fifty-six counties planning to use one or more of the challenged DREs in the November 2006 election," we explained:

> A party is indispensable when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights. *Sprague v. Casey*, . . . 550 A.2d 184 ([Pa.] 1988). "A corollary of this principle is that a party against whom no redress is sought need not be joined. In this connection, if the merits of a case can be determined without prejudice to the rights of the absent party, the court may proceed." *Id.* . . . at 189 (citations omitted).

> Section 7540(a) of the Declaratory Judgments Act states that, when declaratory relief is sought, all persons shall be made parties who have any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. 42 Pa.[ ]C.S. § 7540(a). While the provision is mandatory,

16

it is subject to limiting principles. *City of Philadelphia v.* [*Cmwlth.*], . . . 838 A.2d 566 ([Pa.] 2003).

*Banfield I*, 922 A.2d at 43-44. In rejecting the argument that the fifty-six counties were indispensable parties, we opined:

> Here, [the e]lectors do not seek redress from the fifty-six counties, and, because the November 2006 election has passed, the fifty-six counties will not be prejudiced by a judgment in favor of [the e]lectors. Even absent a request, the Secretary could de-certify a DRE at any time based solely on the statutory requirements for certification, and counties using certified DREs must be prepared for that possibility.

*Id.* at 44.

With regard to the Secretary's preliminary objection based on standing, we explained and held as follows:

> To establish standing, [the e]lectors must allege a substantial, direct and immediate interest in the outcome of the litigation. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, . . . 346 A.2d 269 ([Pa.] 1975). An interest is substantial if it surpasses the common interest of all citizens in obedience to the law; an interest is direct if it is harmed by the matter that is the subject of the complaint; and an interest is immediate if it is not remote or speculative. *Id.*
>
> [The e]lectors have alleged a substantial interest in the certification of the challenged DREs by asserting that, unlike all citizens, they are required to vote using DREs that are not reliable or secure and that do not provide a means for vote verification or vote audit. [The e]lectors have alleged a direct interest by asserting that, because of such deficiencies, [the e]lectors have "no way of knowing" whether the DREs will recognize their votes in an election. Finally, [the e]lectors have alleged an immediate interest by asserting that "each wants to cast a ballot" in future elections, and "each wants their future votes . . . to be properly counted and weighted." Thus, [the e]lectors have standing.

*Banfield I*, 922 A.2d at 44 (footnote omitted) (record citations omitted).

With regard to legal insufficiency, we considered several such preliminary objections, including as to whether the Secretary violated Section 1101-A of the Election Code by certifying DREs that do not create a "permanent physical record,"

17

*see* 25 P.S. § 3031.1, that can be retained and used to audit voting results. Although the Secretary sought to dismiss this claim on the basis that Section 1101-A does not require a "voter[-]verified independent record," we observed that Section 1117-A of the Election Code, 25 P.S. § 3031.17, "requires that the county board of elections conduct 'a statistical recount of a random sample of ballots after each election *using manual, mechanical or electronic devices of a type different than those used for the specific election.*'" *Banfield I*, 922 A.2d at 47 (quoting 25 P.S. § 3031.17) (emphasis in original). We rejected the Secretary's argument, noting that "[t]he Secretary d[id] not explain, and, *at this stage of the proceedings*, there is no evidence to explain how a board is to conduct a statistical recount using a different type of device if the permanent physical record of each vote cast on a DRE is not independent of the data in the electronic storage system." *Id.* (emphasis added). We likewise rejected the Secretary's argument that some DREs satisfied the "permanent physical record" requirement because they had a "Ballot Image Retention" (BIR) feature, concluding that those particular DREs were not identified in the [p]etition and noting that the electors disputed whether a BIR was a "permanent physical record." *Id.*

We also considered whether the electors' claim based on Article I, Section 5 of the Pennsylvania Constitution was legally insufficient because they failed to plead a constitutional injury. We wrote:

> Our [S]upreme [C]ourt has stated that elections are free and equal under Article I, Section 5:
>
>> when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; *when each voter under the law has the right to cast his ballot and have it honestly counted*; when the regulation of the right to exercise the franchise does not deny the franchise itself, . . . and when no constitutional right of the qualified elector is subverted or denied him.

18

*In re 1991 [Pa.] Legislative Reapportionment Comm[']n*, . . . 609 A.2d 132, 142 ([Pa.] 1992) (emphasis added) (quoting *City Council v. Marcincin*, . . . 515 A.2d 1320, 1323 ([Pa. ]1986)).

> [The e]lectors allege that the Secretary's certification of the challenged DREs will make it "likely that a significant number of votes will not be counted accurately, or at all." [The e]lectors also incorporate the allegation that they have "no way of knowing" whether a DRE has recognized their votes so that they will be counted. Because [the e]lectors have a right under Article I, Section 5 of the Pennsylvania Constitution to have their votes honestly counted and because [the e]lectors have no way of knowing whether their votes will be honestly counted by DREs that are not reliable or secure and that provide no means for vote verification or vote audit, [the e]lectors have pled an injury under Article I, Section 5.

*Banfield I*, 922 A.2d at 48 (emphasis in original) (record citations omitted).

We similarly considered whether the electors' claim based on Article I, Section 26 of the Pennsylvania Constitution was legally insufficient because they failed to allege an equal protection violation. We opined:

> [The e]lectors allege that their equal protection rights are at risk because, "while they are compelled to vote in counties using the certified DRE voting systems, other registered voters in Pennsylvania may vote in precincts or counties using voting systems . . . that do not suffer from the [identified] defects" of the DREs. The Secretary argues that [the e]lectors fail to allege an equal protection violation because Article VII, Section 6 of the Pennsylvania Constitution[15] permits the use of voting machines in some parts of the state without requiring the use of voting machines in other parts of the state. *See* PA. CONST., art. VII, § 6. However, Article VII, Section 6 does not permit DREs that are not reliable or secure and that provide no means for vote verification or vote audit.

*Banfield I*, 922 A.2d at 48 (record citation omitted).

The Secretary asserted a second preliminary objection based on the electors' claim under Article I, Section 26 of the Pennsylvania Constitution, claiming that the

---

[15] "Article VII, Section 6 of the Pennsylvania Constitution [generally provides] that all laws regulating the holding of elections shall be uniform throughout the state." *Banfield I*, 922 A.2d at 49.

19

electors failed to allege a denial of a right thereunder. Again, we rejected the argument, reasoning:

> [The e]lectors allege that the Secretary's certification of the challenged DREs threatens their right to vote because the defects and security flaws create the risk that [the e]lectors' votes will be rendered meaningless or, worse yet, deemed cast for a candidate for whom they did not vote. [The e]lectors also incorporate the allegation that they have "no way of knowing" whether a DRE has recognized their votes so that they will be counted. Because [the e]lectors have a right to vote and because [the e]lectors have no way of knowing whether using the DREs affords them that right, [the e]lectors have pled the denial of a civil right under Article I, Section 26.

*Banfield I*, 922 A.2d at 49 (record citations omitted).

Following the completion of discovery, the electors filed a motion for partial summary relief, which we denied in *Banfield II*. The electors sought summary relief on certain counts "primarily on the basis that, inasmuch as there is no dispute regarding certain technical attributes of the DREs, the DREs fail to comply with specific provisions of the Election Code, thereby entitling [the e]lectors to judgment as a matter of law." *Banfield II*, 51 A.3d at 303.

We considered the electors' contention that they were entitled to summary relief because the DREs do not comply with Section 1101-A of the Election Code, which defines an EVS as a system that, in part, "provides for a permanent physical record of each vote cast," and rejected the notion that the DREs fail to "provide for" such a permanent record. *Banfield II*, 51 A.3d at 303-05. The Court seemingly adopted the Secretary's construction to require "only the capability of providing the specified item upon demand if needed." *Id.* at 305. We then considered whether the DREs create "permanent physical records" of "each vote cast." *Id.* at 305-06. "[W]e disagree[d] with [the electors'] contention that use of the term 'permanent' requires an electronic record that is immune from wrongful or malevolent alteration or

20

destruction or even alteration or destruction resulting from unintentional human error or mishap." *Id.* at 307. Instead, we agreed with the Secretary that "any record, whether paper or electronic, is subject to destruction, loss, tampering or wear" and "that the term must be construed in a manner which serves the purposes of the Election Code." *Id.* "[W]e conclude[d] that a permanent record is one that will remain stable or intact and be available for an indefinite period of time, but at a minimum, twenty days for purposes of recounts, recanvasses, litigation, etc., in state-related contests and twenty-two months in federal-related election matters."[16] *Id.* at 307-08. As to DREs that print ballot images and vote records on thermal paper, which the electors suggested was fragile and prone to fading and deterioration and, therefore, not permanent, we noted that the electors' expert opinion on the permanency of thermal paper was too vague and concluded that "the possibility that vote records printed on thermal paper may not be treated properly to ensure their stability and longevity does not require a declaration that the machines cannot provide a permanent record." *Id.* at 308-09. We concluded that we did not need to address the question of whether electronic vote records satisfy the requirement for a permanent physical record, because, in that case, every certified DRE could provide vote records printed on paper. *Id.* at 309-10.

---

[16] The Court further declined to "construe 'permanent' to denote a vote record immune from human alteration, mishap or loss," concluding that such a construction would render Section 1107-A(11), (12), and (13) of the Election Code redundant and that the electors had not pointed "to any undisputed record evidence that demonstrates that an electronic record, which has been created by a[n] EVS meeting all requirements for certification, cannot be accurately retained for time periods mandated by law." *Banfield II*, 51 A.3d at 308. The Court also found that "the prospect that some counties may actually reuse the electronic storage media in subsequent elections without preserving a printed copy of the vote data or another electronic copy" was immaterial to the issue of whether the certified DREs provide a permanent record of each vote cast. *Id.*

21

We also considered an additional argument—whether the electors were entitled to judgment as a matter of law based on their contention "that the electronic vote records, including the cast vote records or ballot images from which the printed records stem, cannot be deemed a 'record of each vote cast' because there is no way to certify that the records accurately represent each vote cast." *Id.* at 310. The electors based their argument on the fact that "the vote records are 'software dependent' and, therefore, are vulnerable to all the various undetectable maladies plaguing computers and computer software." *Id.* The electors articulated their argument, as follows:

> [E]ven if the data that is stored electronically on DREs were both "permanent" and "physical," there is no way for the Secretary (or anyone else) to certify that it is a "record of each vote cast." Say what you will about paper ballots and the ability to alter them after they have been cast, the systems that incorporate paper ballots will always create an actual record of the actions as expressed by a voter. Even if they are altered after that, that does not change that there was at one time an actual, accurate record of the voter's actions.
>
> The same cannot be said of DRE systems. . . . [E]ven the initial writing of data in a computer's memory is dependent on and affected by the software the computer runs, and if that software is flawed or corrupted, the initial data—and any subsequent copies of it—will not reflect the voter's interaction with the ballot interface. And as there was never a physical ballot to fall back on, the system in such a situation would never create any actual "record" of any actual vote. In short, whereas optical scan systems use voter-created records, DREs generate software-created data that is no more reliable than the software itself. And when for whatever reason the software is not reliable, there is no "record" of the vote at all.

*Id.* at 310 (alteration in original) (citations and footnote omitted).

In rejecting the electors' argument regarding the security and reliability concerns surrounding computer software and computers, we opined:

> First, the Election Code was amended in 1980 to authorize the use of [EVSs]. [EVSs], as designed and defined, register votes electronically, without the need for use of paper ballots or "voter-created" records. *A*

22

*fortiori*, without software, we would not have [EVSs]; software is necessary to register, create and store the voter's action in electronic format. Not only does the [Election] Code not require that vote records be software independent, but such a construction would be absurd, completely incongruous to the amendments defining and authorizing the use of such devices and inconsistent with the state of technology in 1980. Second, while [the electors] are obviously concerned with the vulnerability of the DREs to "malicious or mistaken code, or . . . [a hijack] through a 'man-in-the-middle' attack, or [human error]," the certification and approval process is designed to provide security from such occurrences.

*Id.* at 311 (some alterations in original) (footnotes omitted). In reaching that determination, however, we also noted the opinion of the Secretary's expert:

[I]t is possible to determine easily whether a system is recording, computing and tabulating votes accurately. One casts a known set of ballots that have been previously tabulated manually. A totals report is then produced and the machine totals are compared with those reported by the machine. This is done on a large scale by the [Independent Test Authority] and on a small scale during certification exams.

*Id.* at 311-12 (alteration in original). We further noted the Secretary's expert's opinion that "machines are tested before each election to verify that they are recognizing votes correctly."[17] *Id.* at 312.

Following our denial of the electors' application for partial summary relief and upon consideration of an application for summary relief filed by the Secretary, the Court, through a single-judge order issued on January 29, 2013, and a single-judge memorandum opinion issued on October 1, 2013 (*Banfield III*), ultimately dismissed all counts. Relevant to this matter, in *Banfield III*, the Court

---

[17] Additionally, the electors argued that they were entitled to judgment in their favor with respect to two counts of their petition relating to their constitutional claims, asserting that "the Secretary's allegedly improper certification of the DREs at issue resulted in constitutional violations as well." *Banfield II*, 51 A.3d at 314 n.34. The Court reasoned that the electors were not entitled to the requested relief on those counts given its conclusion that the electors had "not demonstrated that the certifications were illegal thereby entitling them to judgment as a matter of law." *Id.*

observed that the electors sought relief in three of the counts at issue based on a failure to comply with the certification requirements set forth in Section 1107-A(11), (12), and (13) of the Election Code, which are likewise at issue in this matter, as well as Section 1107-A(16)(iii) and (17)(i), relating to tamper-proof requirements. *Banfield III*, slip op. at 3-4. The electors contended that the DREs were neither capable of the required accuracy nor sufficiently tamper-proof, that the Secretary's testing procedures did not ensure full compliance with the subject provisions, and that the Secretary failed to adopt adequate testing procedures.

The Court noted that, because the electors were seeking mandamus relief on the basis that the Secretary "failed to properly exercise her discretion in the performance of [her] duty" to certify DREs as required under the Election Code, the electors "must establish that the Secretary performed her statutory duties arbitrarily, fraudulently or under a mistake of law." *Banfield III*, slip op. at 5. The Court further explained that, "to prevail in their quest to de-certify the challenged DREs, [the electors] must establish that the DRE voting systems actually fall short of the statutory requirements for accuracy and security from tampering." *Id.* Indeed, to survive summary relief, the record had to "contain some evidence that would support such a finding," and electors could not prevail "without supportive expert opinion" given that the workings of EVSs were outside "the skill and knowledge of the ordinary layman." *Id.*, slip op. at 5-6.

The *Banfield III* Court concluded that the electors failed to produce any evidence "that the challenged machines fail[ed] to accurately record votes when properly used. Rather, review of the expert reports disclose[d] that [the electors could] establish no more than that a possibility exists that the challenged DREs could in theory be subject to tampering or human error." *Banfield III*, slip op. at 6. The

24

Court added that "the possibility that tampering can produce inaccuracy does not render the DREs incapable of the absolute accuracy required under the Election Code," nor do uncovered vulnerabilities "establish the presence of unacceptable security procedures." *Id.*, slip op. at 6-7. The Court explained, "[s]ince voting will always be vulnerable to fraud, a mere possibility of a security breach is not alone sufficient to warrant overriding the Secretary's determination to certify the systems." *Id.* at 8. The Court added that, "because the experts have failed to establish that the Secretary's testing procedures and the DREs that she certified create more than a mere possibility of error in recording and tabulating votes," the electors' claims failed. *Id.* In sum, the Court explained that "more than a mere possibility of inaccuracy or insecurity is required to justify the relief" sought by the electors, whom the Court thus viewed instead as largely demanding improper oversight of the Secretary's discretion. *Id.*, slip op. at 5, 9.

Further, the Court concluded that the constitutional claims at issue[18] could not survive given that those claims were based "on the premise that the challenged DREs are so inaccurate and insecure as to infringe on the right to vote and the requirement for uniform election regulation"—a premise the electors failed to prove. *Banfield III*, slip op. at 10. The electors then appealed to the Supreme Court.

---

[18] Notably, the electors' constitutional claims included claims similar to those asserted by Petitioners here. In this regard, the electors alleged that the certification of the DREs at issue: (1) "create[s] the risk that persons for whom the majority of voters have not cast their ballots will be declared the election winners and will take office, in contravention of the very essence of our democracy," in violation of Article I, Section 5 of the Pennsylvania Constitution, and (2) "threatens [the electors'] fundamental right to vote because the voting systems' defects and security flaws create the risk that [the electors], together with other Pennsylvania voters, have their votes rendered meaningless or, worse yet, deemed cast for a candidate for whom they did not vote" in violation of Article I, Section 26 of the Pennsylvania Constitution. *Banfield III*, slip op. at 9-10 nn.5-6.

25

Among the issues addressed on appeal, and most relevant to this matter, were claims relating to the electors' security concerns. Before the Supreme Court, the electors argued that this Court erred in finding that the DREs satisfied the requirements related to a DRE's security from tampering outlined in Section 1107-A(12) and (16)(iii) of the Election Code, 25 P.S. § 3031.7(12), (16)(iii). The electors argued that the DREs at issue could not be deemed to have sufficient protection against tampering because security vulnerabilities make it possible to alter votes. The electors argued "that the plain language of the statute is obligatory as it provides that an [EVS] '*shall* preclude every person from tampering with the tabulating element,'" taking the position that Section 1107-A(16)(iii) of the Election Code "does not include the qualifier 'when properly used' and assert[ing] the Legislature drafted this section in absolute terms." *Banfield IV*, 110 A.3d at 172 (emphasis in original) (citations omitted).

The Supreme Court characterized the electors' argument as "advocating that the DREs be held to an impossible standard of invulnerability." *Id.* at 174. The Supreme Court "agree[d] with the Commonwealth Court's finding that the mere possibility of error cannot bar the use of a voting system as 'the unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used.'" *Id.* (emphasis in original) (quoting *Banfield III*, slip op. at 8).

The Supreme Court expounded on the imperfections of voting systems at length:

> While [the electors] claim traditional paper ballots and optical scan voting are preferable alternatives, they fail to acknowledge that such systems are also vulnerable to tampering as paper ballots can be easily destroyed or altered by an individual intending to manipulate the election result. Moreover, paper ballots may fail to accurately record voter intent as a result of mechanical or human error that leads to the

26

invalidation of votes, in cases where ballots have not been completed in a correct and comprehensible manner, contain an overvote or undervote based on the number of permitted selections in an election, or contain markings that cannot be read by an optical scanner. As all voting systems are imperfect and not immune from tampering, the Election Code cannot be read to impose a requirement that cannot be achieved.

As the question of whether an electronic system has adequate security measures against tampering necessarily results in a subjective determination, the Legislature delegated this discretionary decision to the Secretary, who is . . . Pennsylvania's chief election official. *Kuznik v. Westmoreland Cnty. Bd. of Comm'rs*, . . . 902 A.2d 476, 502 ([Pa.] 2006). We have previously held that "a reviewing court will ordinarily defer to an agency's interpretation of a regulation or a statute it is charged to enforce." *Id.* (citation omitted).

> [W]hen the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation. . . . Thus, our courts will not disturb administrative discretion in interpreting legislation within an agency's own sphere of expertise absent fraud, bad faith, abuse of discretion or clearly arbitrary action.

*Id.* (quoting *Winslow-Quattlebaum v. [Md.] Ins. [Grp.]*, . . . 752 A.2d 878, 881 ([Pa.] 2000)) (affording "great deference" to state election officials' interpretation of the Election Code in determining whether HAVA preempted Pennsylvania's referendum requirement).

As noted above, the Commonwealth Court found the Secretary was entitled to summary relief on this claim as [the electors] had not shown any more than the mere possibility that the certified DREs in theory could be subject to tampering, presenting no evidence that the challenged devices have failed to accurately record votes or experienced a security breach in an actual election. Upon [the electors'] request, the Secretary conducted reexaminations of the DREs with the assistance of an examiner, who reviewed federal test results of federal independent testing authorities (ITAs), created test protocols for each DRE, and performed penetration analyses to test the voting systems' security. In addition, the Secretary considered the competing opinions of the parties' experts and the studies cited by [the electors] identifying vulnerabilities in the security of the certified DREs. Taking all of this information into consideration, the Secretary determined that the DREs

satisfied each of the Election Code's requirements, finding their vulnerabilities do not render them necessarily defective and unfit for use in an election when they have successfully worked to accurately record and tabulate votes in countless Pennsylvania elections. As [the electors] have not alleged the Secretary's certification of the DREs was fraudulent, in bad faith, an abuse of discretion or clearly arbitrary, we decline to disturb her administrative discretion in overseeing the implementation of the Election Code which is entitled to great deference.[19]

*Banfield IV*, 110 A.3d at 174-75.

The electors also argued that the Commonwealth Court erred in rejecting their constitutional challenges as they related to the electors' security concerns. In concluding that the electors were not entitled to relief, the Supreme Court opined:

[W]e find no merit in [the electors'] claim that the Secretary's certification of the DREs violated the fundamental right to vote or resulted in disparate treatment of any group of voters. As the Election Code bestows upon the Secretary the responsibility to choose between several voting systems with varying advantages and disadvantages, we see no reason to interfere with the Secretary's discretion in certifying the DREs at issue absent a showing that the decision was unreasonable or discriminatory.

*Id.* at 178.

Despite the requirements of Section 1107-A of the Election Code, the Pennsylvania Supreme Court has acknowledged that "all voting systems are imperfect and not immune from tampering" and "the mere possibility of error cannot bar the use of a voting system." *Banfield IV*, 110 A.3d at 174. Thus, the Election Code does not require "an impossible standard of invulnerability" or "impose a requirement that cannot be achieved." *Id.* With this backdrop in mind, our Supreme Court has made clear that the Secretary's "administrative discretion in overseeing the implementation of the Election Code . . . is entitled to great deference" and will

---

[19] The Supreme Court relied on this analysis to conclude that the electors were not entitled to mandamus relief. *Banfield IV*, 110 A.3d at 175.

28

not be disturbed by the judiciary absent a showing that "the Secretary's certification . . . was fraudulent, in bad faith, an abuse of discretion or clearly arbitrary." *Id.* at 175. This is consistent with the deference that Pennsylvania courts generally bestow on an agency tasked with implementing a legislative enactment. *See Kuznik*, 902 A.2d at 502. Moreover, where "the statutory scheme is complex," as is the case in this instance, "the reviewing court must be even more cautious in substituting its discretion for the expertise of an administrative agency." *Laundry Owners Mut. Liab. Ins. Ass'n v. Bureau of Workers' Comp.*, 853 A.2d 1130, 1136 (Pa. Cmwlth. 2004) (quoting *Graduate Health Sys., Inc. v. Pa. Ins. Dep't*, 674 A.2d 367, 370 (Pa. Cmwlth. 1996)).

### III. PRELIMINARY OBJECTIONS

### A. Failure to State a Claim (Counts I-IV)

The Secretary argues that the Election Code violations asserted in Counts I-IV of the Petition should be dismissed because Petitioners have failed to allege facts that, even if true, would suffice to state a claim for a violation of the Election Code under those counts. In short, the Secretary claims that Petitioners must allege facts demonstrating that her decision to certify the ExpressVote XL machines under the statutory provisions at issue—which is a discretionary, subjective decision entitled to great deference—was "fraudulent, in bad faith, an abuse of discretion or clearly arbitrary." *Banfield IV*, 110 A.3d at 175. The Secretary contends that, here, Petitioners' allegations consist of theoretical deficiencies in the ExpressVote XL machines that fall short of justifying judicial interference with the Secretary's decision to certify the machines.

For instance, with regard to Counts I-III of the Petition, relating to the security and accuracy of the ExpressVote XL machines, the Secretary characterizes those

29

counts as criticizing three discrete design features—*i.e.*, the administrator access panel, the test deck feature, and the paper path. The Secretary contends, however, that Petitioners base their assertions regarding the exploitation or malfunctioning of these features on theory as opposed to any real-world occurrences or testing that would demonstrate that these alleged outcomes have occurred or are actually possible. As to Count IV of the Petition, relating to voter privacy and secrecy, the Secretary characterizes that count as narrowly focusing on the ExpressVote XL machines' storage of ballots chronologically and the procedure used for ballot spoliation, which requires a poll worker to enter the voting booth to provide assistance. The Secretary points out that Petitioners do not allege that the claimed flaws have ever resulted in an invasion of any voter's privacy while voting or the exposure of any elector's vote selection. The Secretary notes that, while Petitioners allege that issues occurred when the machines were used in the November 2019 election in Northampton and Philadelphia Counties, Petitioners fail to aver that any of those issues were connected to the alleged theoretical flaws identified in the Petition.

The Secretary maintains that, other than "boilerplate, rote incantation of the legal standard," which in and of itself is insufficient, the Petition lacks "factual allegations to support the bald assertions that the Secretary 'abused her discretion and acted clearly arbitrarily' when she certified the ExpressVote XL" machines "and that her reexamination of this voting system 'was conducted in bad faith.'" (Secretary's Brief at 17 (quoting Petition ¶¶ 253-54).) The Secretary adds that Petitioners are mistaken insofar as they claim that they need not plead such facts at this stage, that their claims survive because they are similar to the claims that

30

survived preliminary objections in *Banfield I*, and that they will be able to further substantiate their claims once they are able to take discovery.

Petitioners counter by first addressing the Secretary's arguments that Petitioners have alleged only theoretical flaws in the ExpressVote XL machines that are not based on empirical evidence. Petitioners respond that the ExpressVote XL machines have never been made public to Petitioners or anyone else in the technological field for inspection, noting that even the Secretary's reexamination of the machines occurred in Colorado, as opposed to Pennsylvania, and was open to personnel of the Department of State only. Furthermore, the Secretary obtained a stay of discovery in this case, thereby preventing Petitioners from accessing the machines thus far in the litigation. Based on these circumstances, Petitioners posit that any lack in empirical evidence is due to the lack of their ability to inspect or assess the machines due in large part to the actions of the Secretary. Petitioners add that they identify in their Petition specific security, accuracy, and secrecy issues that arose during the November 2019 election in Philadelphia and Northampton Counties with the use of the ExpressVote XL machines. Additionally, Petitioners aver in their Petition that the ballot spoliation process employed in at least Philadelphia County in the November 2019 election violated voters' right to vote in secrecy.

Petitioners also argue that the Secretary is urging the Court to apply an incorrect legal standard at this stage of the pleadings. Specifically, Petitioners argue that the Secretary's contention that Petitioners must allege facts showing that the Secretary's certification was "fraudulent, in bad faith, an abuse of discretion or clearly arbitrary" in order to challenge it successfully is based upon a misinterpretation of our Supreme Court's decision in *Banfield IV*. Petitioners reason that the standard set forth above is the standard of deference to be utilized *after*

31

Petitioners have had the opportunity to take discovery and present evidence. The standard of deference, they assert, is not the legal standard to be applied at the pleading stage of litigation. Petitioners contend that they have raised well-pled allegations concerning the ExpressVote XL machines' inability to conform to the Election Code, which is enough to survive dismissal under *Banfield I*, where this Court did not mention the necessity to plead fraud, bad faith, abuse of discretion, or clear arbitrariness in overruling a preliminary objection arguably similar to that asserted by the Secretary here. Regardless, Petitioners maintain that their pleading meets even this incorrect standard, because they pled that, "[o]n information and belief, the Secretary's reexamination of the ExpressVote XL [machines] was conducted in bad faith." (*See* Petition ¶¶ 250-54.) Petitioners assert they have pled sufficient facts to state a claim under Counts I-IV of the Petition and, as such, are entitled to proceed on those counts, including by taking discovery into the circumstances of the Secretary's certification and reexamination.

Here, Petitioners have identified vulnerabilities and deficiencies in the ExpressVote XL machines that they allege render them in violation of Section 1107-A(1), (11), (12), and (13), and Section 1111-A(b) of the Election Code. For instance, Petitioners aver that the machines have the ability to change votes prior to ballot impoundment due to the mechanism of the machines' single paper path and the manner in which its software and hardware could be manipulated to malfunction. (Petition ¶¶ 93-127.) Petitioners also allege that the ExpressVote XL machines' administrator access panel, which contains items such as a USB drive containing election results and a "CFLASH card" containing machine software, is readily available to voters while they are hidden from view of the poll workers. (Petition ¶¶ 128-31.) Petitioners allege that, while the administrator access panel is

protected by a lock, the locks on every machine in a given county are identically keyed and can be "picked quickly" or accessed via a stolen or copied key across districts for all future elections. (Petition ¶¶ 132-35.) Further, "[d]uring the election on November 5, 2019[,] in Philadelphia, voters took photos of unlocked panels in at least three polling places." (Petition ¶ 136.) Petitioners also claim that the ExpressVote XL machines' test deck software, which can "create and submit completely digital ballots for tabulation without using a paper record," exists on the ExpressVote XL machines during regular operations and, if hacked, has the potential to manipulate votes. (Petition ¶¶ 141, 145, 147.)[20] With respect to the ExpressVote XL machines' secrecy issues, Petitioners aver that a voter's ballot could be identified as a result of: (1) the machines' storing of ballots in chronological order, and (2) the machines' spoliation procedure, which requires a poll worker to enter the voting booth and retrieve the ballot card, thereby enabling the poll worker to see and know the voter's vote at a time it can still be legally cast.[21] (Petition ¶¶ 158-68, 180-92, 194.)

Petitioners further aver that the ExpressVote XL machines were used for the first time in the November 2019 election in Northampton and Philadelphia Counties and that several issues with the ExpressVote XL machines were reported during and after that day, including machines that stopped working or would not start; touchscreens that were too sensitive or not sensitive enough; touchscreens that

___

[20] "Northampton County used the Test Deck feature during its logic and accuracy tests on and around October 9, 2019." (Petition ¶ 147.)

[21] With regard to the spoliation procedure, Petitioners aver that a poll worker training video recorded on November 3, 2019, in Philadelphia County "highlights the high probability that the legal procedures for spoiling a ballot will be violated and secrecy will not be maintained," as demonstrated by the trainer's comments made in the video. (*See* Petition ¶ 197 (averring that trainer directed poll workers to "let [the voter] know [the poll worker is] coming in to spoil the[] ballot" and advising poll worker to "not look at the[] selections" or tell anyone if they do).)

registered a vote for a candidate or other voting target the voter did not touch and for which the voter did not intend to cast a vote; votes being incorrectly tabulated, resulting in the need to re-scan all ballots using a high-speed scanner; some machines that showed no votes for certain candidates; and entire precincts that reported no votes for certain candidates. (Petition ¶¶ 264-65.)[22] Petitioners also allege that the Secretary "abused her discretion and acted clearly arbitrarily" in certifying the ExpressVote XL machines notwithstanding the issues identified in the Petition, and that her "reexamination of the ExpressVote XL [machines] was conducted in bad faith." (Petition ¶¶ 253-54.)

Upon review, we agree with the Secretary that Petitioners must demonstrate that the Secretary's decision to certify the ExpressVote XL machines under Sections 1107-A(1) and (11)-(13) of the Election Code was "fraudulent, in bad faith, an abuse of discretion or clearly arbitrary" in order to succeed on their claims arising out of those provisions. Nonetheless, based on the averments outlined in the Petition and the reasonable inferences deduced therefrom and resolving all doubt in favor of Petitioners, it is unclear as a matter of law at this juncture that her decision to certify the ExpressVote XL machines as complying with those provisions at issue was not "fraudulent, in bad faith, an abuse of discretion or clearly arbitrary." As further factual development is necessary to analyze the Secretary's certification decision in this regard, we overrule the Secretary's preliminary objection raising a demurrer to the Election Code violations asserted in Counts I-IV of the Petition.

---

[22] This citation refers to the second set of paragraphs numbered 264 and 265 in the Petition.

## B. Failure to State a Claim Under Constitutional Provisions
### (Counts IV and VI)

The Secretary likewise objects to Petitioners' constitutional claims in Counts IV and VI of the Petition on the basis that they fail to state a claim for which relief may be granted. The Secretary argues that Petitioners' allegations, even if true, would not establish that the Secretary's decision to certify the ExpressVote XL machines was unreasonable, discriminatory, or "severely restrict[s] the right to vote," *Banfield IV*, 110 A.3d at 177-78, or constituted a "plain, palpable, and clear abuse of . . . power which actually infringes on the rights of the electors," *League of Women Voters v. Commonwealth*, 178 A.3d 737, 793 (Pa. 2018), as is required to succeed on their claims. Rather, the Petition merely avers that certain design features and aspects of functionality of the ExpressVote XL machines create theoretical security and performance vulnerabilities and could theoretically undermine voter privacy. The Secretary adds that, to the extent Petitioners argue that this standard only applies to legislative enactments as opposed to executive action, they offer no support for that proposition. Further, the Secretary submits that, insofar as Petitioners rely upon *Banfield I* to argue that they have pled sufficient facts to sustain their constitutional claims, *Banfield I* is inapposite because it was based on different factual allegations and decided before the Supreme Court had opined on the relevant legal standard in *Banfield IV*.

Petitioners argue that they have pled viable constitutional claims pursuant to *Banfield I*, as they set forth a clear constitutional injury by the executive branch— that by certifying the ExpressVote XL machines, the Secretary has violated their constitutional rights by failing to provide voters with voting machines that ensure that their votes are honestly counted. Petitioners add that, in arguing to the contrary, the Secretary again advocates for application of an improper legal standard.

35

Moreover, Petitioners claim that they have nonetheless pled the standard asserted by the Secretary in alleging that, "[b]y certifying the ExpressVote XL [machines] while being aware that the machine[s] violated the Election Code in the many ways already detailed in the Petition, the Secretary committed a plain, palpable, and clear abuse of power that infringes on the voting rights of the Individual [Petitioners] and of [NEDC's and CBE's] individual members." (*See* Petition ¶ 255.)

Similar to our conclusion above, we hold that Petitioners have alleged sufficient facts at this stage of the litigation to proceed on their constitutional claims. Insofar as the Supreme Court has determined that the Secretary's discretion in certifying voting machines will not be disturbed on constitutional grounds "absent a showing that the [Secretary's] decision was unreasonable or discriminatory," *Banfield IV*, 110 A.3d at 178, based upon the allegations set forth in the Petition and the reasonable inferences deduced therefrom and again resolving all doubt in favor of Petitioners, it is unclear as a matter of law at this point whether the Secretary's decision was "unreasonable or discriminatory." Thus, we overrule the Secretary's preliminary objection raising a demurrer to Petitioners' constitutional claims.

### C. Lack of Standing (Counts I-IV)

The Secretary also objects on the basis that Petitioners lack standing to pursue their claims arising under the Election Code set forth in Counts I-IV. The Secretary asserts that Petitioners have failed to allege a "substantial interest" in the outcome of those claims because they do not aver that their alleged concerns about the certification and voting process set them apart from any other voter in Pennsylvania. In particular, the Secretary notes that the Petition is devoid of averments regarding what voting systems are in use in other jurisdictions in Pennsylvania and whether those voting systems share the same alleged imperfections and vulnerabilities of the

ExpressVote XL machines or are more reliable. Rather, Petitioners merely aver that "other registered voters in Pennsylvania *may* vote in precincts or counties using voting systems . . . that do not suffer from the defects identified in this Petition." (*See* Petition ¶ 298 (emphasis added).) Thus, according to the Secretary, this matter is distinguishable from *Banfield I*, where the electors were deemed to have standing because they alleged that, "*unlike all citizens*, [the electors] are required to vote using DREs that are not reliable or secure and that do not provide a means for vote verification or vote audit." *See Banfield I*, 922 A.2d at 44 (emphasis added). The Secretary also challenges the standing of NEDC and CBE noting that "where an organization fails to establish standing on the basis of its membership, allegations that its mission relates to the challenge being pursued are insufficient." (Secretary's Brief at 28 n.8.)

Petitioners counter that Individual Petitioners have standing under this Court's decision in *Banfield I*. Petitioners further challenge the Secretary's claim that Individual Petitioners failed to distinguish themselves from residents of other counties, noting that the voters in Philadelphia, Northampton, and Cumberland Counties are distinct because those counties (and no other counties) purchased the ExpressVote XL machines. In fact, this distinction is why the Secretary contends that those counties are indispensable parties to this action. Petitioners maintain that they need not plead a comparative analysis of the voting methods used in Pennsylvania's other sixty-four counties. As to NEDC and CBE, Petitioners contend that they have standing through their members who have standing. In their Petition, they aver that NEDC has "at least one member who is a resident of Philadelphia County and who has voted in the November 2019 election where the ExpressVote XL [machines were] first used and plans to continue to vote in Pennsylvania

elections where the ExpressVote XL [machines] will be used." (Petition ¶ 15.) Similarly, CBE has "at least one member in each of Philadelphia and Northampton Counties who are residents of such county, who voted in the November 2019 election where the ExpressVote XL [machines were] first used, and who plan to continue to vote in Pennsylvania elections where the ExpressVote XL [machines] will be used." (Petition ¶ 17.)

In reply, the Secretary argues that the mere fact that the ExpressVote XL machines are in use in three Pennsylvania counties and not the others is insufficient to support a finding that the electors in those three counties using the ExpressVote XL machines have a substantial interest. The Secretary claims that, instead, Petitioners must allege facts establishing that Petitioners face a heightened risk of not having their votes counted or having their privacy infringed upon as compared with voters in counties that use other voting machines, based on meaningful functional differences between the ExpressVote XL machines and the other machines used in Pennsylvania. The Secretary contends that it is "[t]hese types of allegations [which] are necessary for Petitioners to make out an interest that 'surpasses the common interest of all citizens in obedience to the law.'" (Secretary's Reply Brief at 9 (quoting *Banfield I*, 922 A.2d at 44).) We disagree.

"Under a traditional standing analysis, the individual initiating the legal action must show that he is aggrieved by the matter that he seeks to challenge," which means he "must have a substantial, direct, and immediate interest in the outcome of the litigation." *Firearm Owners Against Crime v. City of Harrisburg*, 218 A.3d 497, 506 (Pa. Cmwlth. 2019) (en banc), *appeal granted in part*, 230 A.3d 1012 (Pa. 2020). As we explained in *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205 (Pa. Cmwlth. 2018) (en banc):

> A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law. A direct interest requires a causal connection between the asserted violation and the harm complained of. An interest is immediate when the causal connection is not remote or speculative.

*Phantom Fireworks*, 198 A.3d at 1215 (citations omitted). An organization, such as NEDC or CBE, has standing to sue "so long as [the] organization has at least one member who has or will suffer a direct, immediate, and substantial injury to an interest as a result of a challenged action." *Parents United for Better Schs., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 646 A.2d 689, 692 (Pa. Cmwlth. 1994). The Secretary does not appear to contest that Petitioners, as individuals or organizations, have an interest that is "immediate" or "direct." Rather, the Secretary urges the Court to conclude that Petitioners' interest is not "substantial."

As previously noted, the Court in *Banfield I* concluded that the electors had "alleged a substantial interest in the certification of the challenged DREs by asserting that, unlike all citizens, they are required to vote using DREs that are not reliable or secure and that do not provide a means for vote verification or vote audit." *Banfield I*, 922 A.2d at 44. Petitioners have likewise alleged a substantial interest in the certification of the challenged ExpressVote XL machines by asserting that they are required to vote using those machines, which are not reliable or secure. (*See* Petition ¶¶ 32-36.) While Petitioners did not explicitly allege that they are "unlike all citizens" in this regard, the Secretary reads too much into *Banfield I*'s use of that phrase and the general requirement that a litigant's interest must "surpass[] the common interest of all citizens in obedience to the law." *Banfield I*, 922 A.2d at 44. Petitioners need not demonstrate that they are the only people that use the ExpressVote XL machines, nor do they need to show that they face a heightened risk of not having their votes counted or having their privacy infringed upon as compared

39

with voters in counties that use other voting machines based on differences between the voting machines. "[T]he requirement of a 'substantial' interest simply means that the individual's interest must have substance—there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law." *In re General Election 2014*, 111 A.3d 785, 792 (Pa. Cmwlth. 2015) (quoting *Wm. Penn Parking Garage*, 346 A.2d at 282). Here, Petitioners have an interest that is immediate, direct, and more than an "abstract interest" in having the Secretary comply with the law; they have an interest in ensuring that their votes, which are cast through use of the ExpressVote XL machines certified by the Secretary at issue here, are recorded and counted in an accurate, secure, and secret manner. Thus, we overrule the Secretary's preliminary objection raising lack of standing as to Counts I-IV of the Petition.

### D. Nonjoinder of Necessary Parties (Counts I-IV, VI)

The Secretary next claims that all disputed counts of the Petition should be dismissed for Petitioners' failure to join Philadelphia County, Northampton County, and Cumberland County as indispensable parties to this action. The Secretary notes that these counties have already expended significant effort and money in acquiring and implementing the ExpressVote XL machines, and she submits that many of Petitioners' complaints involve ways that the counties' election boards and poll workers allegedly have deployed the machines rather than defects in the machines themselves. The Secretary argues that these counties have an interest in ensuring the orderly administration of elections and in protecting their citizens' voting rights, as well as a financial interest in maintaining their ability to use the ExpressVote XL machines in upcoming elections. According to the Secretary, these interests would be harmed and the counties would be substantially prejudiced in having to replace

40

the machines should Petitioners be granted relief on their claims in the form of decertification of the ExpressVote XL machines, thereby rendering the counties indispensable parties. The Secretary adds that *Banfield I* is inapposite because, *inter alia*, the Secretary recently certified the ExpressVote XL machines—and the counties procured them—as part of an initiative to update the voting technology used throughout the Commonwealth, indicating that the Secretary would not act to decertify them suddenly and without warning.[23] (Secretary's Reply Brief at 9-12.)

Petitioners counter that *Banfield I* is again controlling and requires the Court to overrule the Secretary's preliminary objection asserting nonjoinder of indispensable parties. In so doing, Petitioners emphasize that the timing of any particular election is not dispositive of the jurisdictional question of whether a party is indispensable and that the counties have no right to participate in the Secretary's process of certifying voting machines. Petitioners also argue that the counties do not appear to have any interests that diverge from the Secretary's and, thus, their contributions are likely to be duplicative and burdensome.

Upon review, we agree with Petitioners that *Banfield I* controls our disposition of the Secretary's fourth preliminary objection. In rejecting the Secretary's contention that the electors failed to join as indispensable parties the fifty-six counties planning to use one or more of the challenged DREs in the November 2006 election, the *Banfield I* Court explained that the electors did "not seek redress from

---

[23] The Secretary also argues that, in *Banfield I*, the November 2006 election at issue had already passed, whereas, at the time the Secretary had filed her preliminary objections and supporting briefs here, the November 2020 election had not yet occurred. Indeed, much of the Secretary's argument in support of her preliminary objection asserting nonjoinder of indispensable parties is premised upon the hardship the three counties listed above would face particularly with respect to the November 2020 election should the ExpressVote XL machines be decertified prior to that time. The November 2020 election, however, has obviously already passed at this point.

41

the fifty-six counties, and, because the November 2006 election has passed, the fifty-six counties will not be prejudiced by a judgment in favor of [the e]lectors." *Banfield I*, 922 A.2d at 44. The Court further found it significant that, "[e]ven absent a request, the Secretary could de-certify a DRE at any time based solely on the statutory requirements for certification, and counties using certified DREs must be prepared for that possibility." *Id.*

In the instant matter, Petitioners likewise do not seek redress from the three named counties and, because the November 2020 election has passed, those counties will not be prejudiced by a judgment in favor of Petitioners. Further, because the Secretary can decertify the ExpressVote XL machines at any time based solely on the statutory certification requirements, any county using certified ExpressVote XL machines must be prepared for that possibility. We find the Secretary's attempts to distinguish *Banfield I* to be unpersuasive. We, therefore, overrule the Secretary's preliminary objection asserting a failure to join Philadelphia County, Northampton County, and Cumberland County as indispensable parties.

### E. Time-Barred by Section 5522(b)(1) of the Judicial Code (Counts I-IV, VI)

Finally, the Secretary argues that all disputed counts of the Petition should be dismissed as time-barred under Section 5522(b)(1) of the Judicial Code, 42 Pa. C.S. § 5522(b)(1), which provides:

> **(b) Commencement of action required.--**The following actions and proceedings must be commenced within six months:
>
> > (1) An action against any officer of any government unit for anything done in the execution of his office, except an action subject to another limitation specified in this subchapter.

The Secretary argues that this action plainly is one "against an[] officer of a[] government unit," *i.e.*, the Secretary, for "[some]thing done in the execution of [her] office," *i.e.*, certification of the ExpressVote XL machines, and no other limitations

42

period applies. The Secretary claims that, because she certified the ExpressVote XL machines on November 30, 2018, Petitioners' claims accrued on that date. Thus, Petitioners had until May 30, 2019, to bring their claims in a timely manner. The Secretary argues that, because Petitioners did not institute their action until December 12, 2019, their action must be dismissed as time-barred.

Petitioners counter that Section 5522(b)(1) of the Judicial Code does not bar their claims because: (1) electors are injured every time they must use a deficient voting machine, (2) many of the alleged injuries could not have been known to Petitioners at the time the ExpressVote XL machines were initially certified for use, and (3) sustaining the Secretary's preliminary objection "would create a dangerous and unintended rule that a voting machine's use in the Commonwealth could *never* be challenged by voters if the certification of that machine happened more than six months prior." (Petitioner's Amended Brief at 29 (emphasis in original).) Petitioners also submit that the operative date for purposes of calculating the timeliness of the Petition is September 3, 2019, the date the Secretary issued the Report. Petitioners argue in favor of using September 3, 2019, as the date their claims accrued because the Secretary's Report imposed "additional conditions for certification" that jurisdictions using the ExpressVote XL machines must implement. Petitioners add that concluding otherwise would disincentivize the exhaustion of administrative remedies and "render superfluous" the Secretary's ongoing obligation to reexamine and approve electronic voting machines. (*Id.* at 30-31.)

In response to Petitioners' contentions, the Secretary argues that, to the extent that Petitioners assert an "ongoing injury," the Petition plainly challenges the Secretary's certification of the ExpressVote XL machines, which occurred on

43

November 30, 2018, and this Court has rejected the argument that a continuing violation tolls the statute of limitations in any event. *See, e.g.*, *Fleming v. Rockwell*, 500 A.2d 517, 519 (Pa. Cmwlth. 1985) (rejecting plaintiffs' "argument as to the existence of a continuing violation that precludes the running of the statute of limitations" and explaining that "a statute of limitations begins to run . . . when the plaintiff could have first maintained the action to a successful conclusion"). The Secretary further argues that Petitioners failed to allege any facts or otherwise demonstrate that some of the alleged deficiencies with the ExpressVote XL machines could not have been known to them at the time of initial certification and that Section 5522(b)(1) of the Judicial Code is not subject to any sort of "discovery rule" under the law. The Secretary also contends that, insofar as Petitioners argue that imposing a six-month limitations period would preclude challenges to voting machines if the certification of the machines occurred more than six months prior to the asserted challenge, that is the very purpose of Section 5522(b)(1), which is supported by various policy considerations.

The Secretary adds that, assuming the process for requesting reexamination in Section 1105-A of the Election Code constitutes an administrative remedy that must be exhausted prior to filing suit, allowing a statute of limitations to run only after an administrative remedy has been exhausted would effectively nullify the statute of limitations, as it would permit a petitioner to revive stale claims by simply filing a petition for reexamination and then filing suit within six months of the petition's resolution. The Secretary notes that even assuming the limitations period should be tolled during the period of time needed to exhaust administrative remedies, the six-month limitations period had already expired at the time Petitioners filed their Reexamination Petition on July 16, 2019. The Secretary also argues that the

44

Report's "additional conditions" did not render the original certification unlawful in some new way, thus enabling the limitations period to "restart," and that to conclude otherwise would discourage the Secretary from making a good faith attempt to address concerns raised in reexamination petitions.[24]

Assuming *arguendo* that Section 5522(b)(1) of the Judicial Code applies herein as the Secretary alleges, we conclude that Petitioners' suit is not untimely under that provision. As noted, Section 5522(b)(1) requires that "[a]n action against any officer of any government unit for anything done in the execution of his office" be commenced within six months. 42 Pa. C.S. § 5522(b)(1). Petitioners challenge the Secretary's certification of the ExpressVote XL machines. Though the Secretary is alleged to have initially certified the ExpressVote XL machines on November 30, 2018, she also is alleged to have maintained that certification pursuant to the Report issued on September 3, 2019, in response to Petitioners' Reexamination Petition. In this regard, we note that Section 1105-A of the Election Code provides that a request for reexamination of an EVS may be submitted "at any time" and that the Secretary must act on the request, thereby permitting continual reassessment of the appropriateness of an EVS's certification. 25 P.S. § 3031.5(a)-(c). Thus, while the parties dispute which date between the Secretary's initial certification decision and the issuance of her Report is the proper date of accrual of Petitioners' claims, we conclude that any distinction between the two is of no consequence in light of Section 1105-A, as both actions by the Secretary

---

[24] The parties also spend a significant portion of their argument on this preliminary objection disputing the proper characterization of the nature of Petitioners' action, *i.e.*, whether it is an action sounding in mandamus or an action for declaratory and injunctive relief, as well as the sovereign immunity implications attendant to that determination. At bottom, however, the Secretary argues that Section 5522(b)(1) of the Judicial Code applies to bar Petitioners' action irrespective of the nature of the action.

resulted in the certification of the ExpressVote XL machines. As Petitioners submitted their Reexamination Petition on July 16, 2019, the Secretary issued her Report on September 3, 2019, and Petitioners' instant suit was filed within six months of that date on December 12, 2019, their Petition is timely under Section 5522(b)(1) of the Judicial Code. Thus, we overrule the Secretary's preliminary objection challenging the timeliness of the Petition.[25]

## IV. CONCLUSION

For the reasons set forth above, we sustain the Secretary's preliminary objection as to Count V to the extent that the provisions relevant to that count are no longer included in the Election Code, and we overrule the remaining preliminary objections.

---

P. KEVIN BROBSON, Judge

Judge Covey did not participate in the decision of this case.

---

[25] While we acknowledge the Secretary's concerns regarding use of the reexamination process to "nullify" any limitations period, the Secretary fails to appreciate that Section 1105-A of the Election Code allows for a reexamination request at any time and requires her to act on the request. We further note that such concerns implicate policy considerations more appropriately directed to the General Assembly.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

National Election Defense Coalition, :
Citizens For Better Elections, :
Rich Garella, Rachel A. Murphy, :
Caroline Leopold, Stephen Strahs, :
Kathleen Blanford, Sharon Strauss, :
Anne C. Hanna, Raphael Y. Rubin, :
Robert F. Werner, Sandra :
O'Brien-Werner, Thomas P. Bruno, Jr., :
Roger Dreisbach-Williams, and :
Jeff R. Faubert, :
                 Petitioners :
  :
        v. : No. 674 M.D. 2019
  :
Kathy Boockvar, :
Secretary of the Commonwealth, :
                Respondent :

# **O R D E R**

AND NOW, this 18th day of October, 2021, the preliminary objection filed by Kathy Boockvar, Secretary of the Commonwealth, (Secretary) raising a demurrer to Count V of the Amended Petition for Review Addressed to the Court's Original Jurisdiction (Petition) is SUSTAINED, and that count is DISMISSED. The Secretary's remaining preliminary objections are OVERRULED. The Secretary is hereby ordered to file within 30 days of the date of this order an answer to the remaining counts of the Petition.

 

 

                                     _____
                                       P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

National Election Defense Coalition, :
Citizens For Better Elections, :
Rich Garella, Rachel A. Murphy, :
Caroline Leopold, Stephen Strahs, :
Kathleen Blanford, Sharon Strauss, :
Anne C. Hanna, Raphael Y. Rubin, :
Robert F. Werner, Sandra :
O'Brien-Werner, Thomas P. Bruno, Jr., :
Roger Dreisbach-Williams, and :
Jeff R. Faubert, :
     Petitioners :
            : No. 674 M.D. 2019
     v. :
            : Argued: October 15, 2020
Kathy Boockvar, Secretary of the :
Commonwealth, :
     Respondent :


BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
      HONORABLE PATRICIA A. McCULLOUGH, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge


CONCURRING OPINION
BY JUDGE McCULLOUGH       FILED: October 18, 2021


    I concur in the result and analysis of the majority. I write separately to emphasize my belief, as I expressed in my concurring and dissenting opinion in *Banfield v. Aichele*, 51 A.3d 300 (Pa. Cmwlth. 2012) (*en banc*) (*Banfield II*) (discussed at pages 14-29 of the Majority's opinion), that the legislature, in requiring that electronic voting systems "shall provide for a permanent physical record of each vote cast," intended that voting systems must produce a contemporaneous paper record of each vote cast, so that voters can verify that their votes were recorded

accurately. *Banfield II*, 51 A.3d at 315 (McCullough, J., concurring and dissenting). I explained:

> In addition to not being permanent, the data stored electronically on DREs [Direct Recording Electronic Voting System] is not physical. If the General Assembly intended electronic data to be considered "physical," section 1101-A of the [Pennsylvania Election] Code[1] would have required DREs to provide for a "permanent *electronic* record" (emphasis added) rather than a "permanent physical record." While a memory card or computer chip containing electronic data is "physical," it is not the "record of each vote cast," which is the clear language of the statute.

*Banfield II*, 51 A.3d at 315.

Ultimately, in *Banfield v. Cortes*, 110 A.3d 155, 168 (Pa. 2015) (*Banfield IV*), our Supreme Court found that the Election Code authorizes electronic voting systems that do not utilize paper ballots.

Nevertheless, the voting public's skepticism and discontent has persisted since *Banfield IV*. They have voiced serious concerns that paperless electronic voting machines do not reliably and consistently record, tally, and weigh the votes of Pennsylvania's citizens or produce any permanent physical record of any elector's actual vote. As this is now a matter for the legislature, I respectfully urge that it review the Election Code to ensure these concerns are addressed and assess whether amendment is warranted regarding the requirement that electronic voting systems include the ability to create a voter verified independent and legible record that can be used to audit voting results. As voiced by the electors, if votes

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, added by the Act of July 11, 1980, P.L. 600, 25 P.S. §3031.1.

are cast without the simultaneous creation of any printed confirmation or ballot that can be retained by elections officials for comparison with what the machine records electronically, the right to vote and the integrity of the election process will remain compromised.

 

_____
PATRICIA A. McCULLOUGH, Judge